IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA

        vs.                           Criminal No. 20-173

   DA'JON LENGYEL


-----


   Transcript of Sentencing held on Friday, October 29, 2021, in the United States District Court, 700 Grant Street, Pittsburgh, PA  15219, before Honorable J. Nicholas Ranjan, United States District Judge.


-----


<u>APPEARANCES</u>:

  For the Government:    U.S. Attorney's Office
                         by Shaun Sweeney, Esq.


  For the Defendant:     Martin Dietz, Esq.


  Court Reporter:        Noreen A. Re, RMR, CRR
                         700 Grant Street
                         Suite 5300
                         Pittsburgh, PA  15219


   Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

1                   <u>P R O C E E D I N G S</u>

2                          -----

3        IN OPEN COURT - DEFENDANT PRESENT WITH COUNSEL

4                          -----

5            THE COURT:  We're here today for a sentencing in the

6    case of United States of America versus Lengyel.  I would ask

7    counsel to enter their appearances at this time.

8            MR. SWEENEY:  Shaun Sweeney, Assistant US Attorney,

9    here for the government, Your Honor.

10           THE COURT:  Good morning.

11           MR. DIETZ:  Martin Dietz on behalf of Mr. Lengyel,

12   Your Honor.

13           THE COURT:  Good morning.  Mr. Lengyel, good morning

14   to you.

15           THE DEFENDANT:  Good morning, Your Honor.

16           THE COURT:  Remind me again.  It's Lengyel?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  We also have Mr. Sims here from the

19   United States Probation Office.  Good morning.

20           THE PROBATION OFFICER:  Good morning, Your Honor.

21           THE COURT:  I want to welcome, also, the students

22   from Hampton High School here today who are on a field trip.

23           At this point in time, Mr. Lengyel, I'm going to ask

24   my courtroom deputy to administer the oath to you.

25               (Oath administered.)

1              THE COURT:  Mr. Lengyel, if you could just remain

2    standing for a minute.  Under federal law, I need to make sure

3    that you are competent to participate in today's proceeding.

4    You might remember this from the last time you were before me.

5    So I have to ask you some questions here at the outset to make

6    sure that you're in the right mental state, have a basic

7    knowledge and understanding of this case before we proceed.

8    Remind again how old you are.

9              THE DEFENDANT:  I'm 24, Your Honor.

10             THE COURT:  And how far did you go in school?

11             THE DEFENDANT:  I graduated the 12th grade.

12             THE COURT:  Any trouble reading or understanding the

13   English language?

14             THE DEFENDANT:  No, Your Honor.

15             THE COURT:  Have you been treated recently for any

16   mental illness or addiction to narcotic drugs of any kind?

17             THE DEFENDANT:  I have been treated for mental health

18   illness, but not for narcotics abuse.

19             THE COURT:  Are you taking any medication currently

20   for mental illness?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Tell me about your current mental state,

23   the medication you're on.  Is it treating your mental illness

24   such that you're thinking clearly presently?

25             THE DEFENDANT:  Yes, Your Honor.

1                 THE COURT:  Are you currently under the influence of

2     any other kind of drug, medication or alcoholic beverage of

3     any kind?

4                 THE DEFENDANT:  No, Your Honor.

5                 THE COURT:  Have you been able to speak with your

6     lawyer, Mr. Dietz, about this case?

7                 THE DEFENDANT:  Yes, Your Honor.

8                 THE COURT:  And have you been able to discuss

9     sentencing with him, as well as review the presentence report

10    in this case?

11                THE DEFENDANT:  Yes, Your Honor.

12                THE COURT:  Mr. Dietz, any doubts as to Mr. Lengyel's

13    competence to participate?

14                MR. DIETZ:  No, Your Honor.

15                THE COURT:  Mr. Sweeney, based on what you know, do

16    you have any doubts?

17                MR. SWEENEY:  No basis for any doubt, Your Honor.

18                THE COURT:  All right.  Thank you, everyone.

19    Mr. Lengyel, I do find that you are competent to participate

20    in this proceeding.  Both of you may sit down at this point.

21    Thank you.

22                Prior to the sentencing, I received the final PSR and

23    addendum, as well as position statements and sentencing

24    memoranda for the parties, as well as I received an E-mail

25    from the parties detailing the agreement as to restitution for

1    the police car in this case.

2           I also received a recommendation from the probation

3    office for an appropriate sentence.  That's something that was

4    submitted to me under seal and which I cannot, under our local

5    rules, disclose to any of you.  That said, even though I have

6    that recommendation, I do not defer to it.  And I will

7    independently review all materials, the guidelines and the law

8    and independently determine an appropriate sentence in this

9    case.

10          I would ask counsel now, are there any additional

11   written materials that anyone believes that I need to see?

12   Mr. Sweeney?

13          MR. SWEENEY:  Nothing from the government, Your

14   Honor.

15          THE COURT:  Mr. Dietz?

16          MR. DIETZ:  No, Your Honor.

17          THE COURT:  And other than arguments of counsel and a

18   statement by Mr. Lengyel, if he wishes to make one, does

19   anyone intend to present additional testimony, victim

20   statements or any other evidence today?  Mr. Sweeney?

21          MR. SWEENEY:  I do, Your Honor.  I intend to present

22   the testimony of a police officer who will authenticate and

23   describe the contents of the video that we provided to the

24   Court and to Mr. Dietz.  The video in its entirety should be

25   somewhere between five and ten minutes.

1              THE COURT:  Okay.  Thank you.  Mr. Dietz, how about

2    on your end?

3              MR. DIETZ:  No, Your Honor.

4              THE COURT:  Before we get into that, I would like to

5    formally determine the calculation of the guidelines range in

6    this case and also determine whether or not I can adopt all or

7    parts of the presentence report.

8              Before I do that, as I do with all my sentencing

9    hearings, I'm going to place this next portion of the record

10   under seal, in the event anyone wishes to raise any

11   confidential or sensitive information with me.  So let's place

12   this next portion of the record under seal at this time.

13             (Sidebar discussion held.)

14             (Sidebar discussion concluded.)

15             THE COURT:  Any objections to or errors in the

16   presentence report, Mr. Sweeney?

17             MR. SWEENEY:  None from the government, Your Honor.

18             THE COURT:  Mr. Dietz?

19             MR. DIETZ:  No, Your Honor.

20             THE COURT:  My understanding, Mr. Sweeney, is the

21   government will move for an extra point reduction under 3E1.1

22   for acceptance of responsibility; is that right?

23             MR. SWEENEY:  Yes, Your Honor.  The full three

24   points.

25             THE COURT:  All right.  Thank you.  I'll grant that

1        in Count 4, the full three points, when I calculate the

2        guidelines range in this case.

3                My understanding is that there are no formal motions

4        for departure that would affect how I calculate the

5        guidelines, no additional statutory enhancements.  The

6        government did not file any information to establish prior

7        convictions and that there are no statutory mandatory minimums

8        here in this case.  Is all of that correct, Mr. Sweeney?

9                MR. SWEENEY:  I agree with all that, Your Honor.

10               THE COURT:  Thank you.  Mr. Dietz?

11               MR. DIETZ:  That's correct, Your Honor.

12               THE COURT:  Thank you.  All right.  Having resolved

13       all pending matters relating to sentencing guidelines

14       calculations, I will adopt the factual findings and guideline

15       applications in the presentence report.  As set forth in the

16       presentence report, I find that the base offense level is 20.

17               After a combined three-level downward adjustment for

18       acceptance of responsibility, I calculate a total offense

19       level of 17.  Mr. Lengyel's criminal history score is five,

20       which establishes a criminal history category of III.  As set

21       forth in the presentence report, a total offense level of

22       17 and a criminal history category of III results in a

23       guidelines range of 30 to 37 months incarceration and one to

24       three years of supervised release.

25               The guidelines also provide for a fine range for this

1       offense of $10,000 to $95,000.  Since the applicable

2       guidelines range is in Zone D of the sentencing table,

3       Mr. Lengyel is ineligible for probation.  I note that the

4       United States Supreme Court has declared these guidelines to

5       be advisory; and, therefore, it's no longer mandatory for me

6       to follow them.

7               Any objections or errors in my calculation of the

8       guidelines?  Mr. Sweeney?

9               MR. SWEENEY:  No, Your Honor.

10              THE COURT:  Mr. Dietz?

11              MR. DIETZ:  No, Your Honor.

12              THE COURT:  As I mentioned, as part of the sentence

13      in this case, I may include a period of supervised release.

14      Mr. Lengyel, as you might recall from the last time you were

15      before me, supervised release is basically a period of

16      probation after you get out of prison.  And there are a lot of

17      conditions that you typically must follow while on supervised

18      release.

19              On October 22, 2021, I issued some tentative

20      findings.  And among those findings were some tentative

21      conditions of supervised release.  Specifically I intended to

22      impose the mandatory and required conditions of supervised

23      release.  Specifically, Mr. Lengyel, while on supervised

24      release, cannot commit another federal, state or local crime.

25              He cannot unlawfully possess a controlled substance.

1    He must refrain from any unlawful use of a controlled

2    substance and also submit to drug testing.  And he must make

3    restitution payments as required and must also cooperate in

4    the collection of DNA, as directed by the probation office.

5           Additionally, because restitution will be part of the

6    sentence in this case, I included some additional supervised

7    release terms.  Specifically, that Mr. Lengyel shall report

8    any change of address to the US Attorney's Office.  That's so

9    that the US Attorney's Office can keep track of any

10   restitution obligations.  Mr. Lengyel will be prohibited from

11   incurring new credit charges or opening additional lines of

12   credit without the prior written approval of the probation

13   office.

14          I would make restitution a condition of supervised

15   release; however, would have the payment pursuant to an

16   installment payment plan.  Mr. Lengyel would have to provide

17   the probation office with access to any requested financial

18   information.  And separate and apart from that, I note that

19   from the presentence report some mental health diagnoses in

20   Mr. Lengyel's background.  So I included a condition that

21   Mr. Lengyel should participate in a mental health assessment

22   and/or treatment program approved by the probation office.

23          I would ask counsel now, are there any issues or

24   objections or anything, any questions with respect to those

25   tentative conditions of supervised release?  Mr. Sweeney?

1          MR. SWEENEY:  Not from the government, Your Honor.

2          THE COURT:  Mr. Dietz?

3          MR. DIETZ:  No, Your Honor.

4          THE COURT:  All right.  Thank you.  At this time I'll

5     hear from counsel, as well as Mr. Lengyel, as to additional

6     information that they wish to present and also hear arguments

7     for an appropriate sentence.

8          As you know, after calculating the guidelines and any

9     departure motions, I now must consider the relevant factors

10    set out by Congress at 18 US Code, Section 3553(a), and ensure

11    that I impose a sentence that is sufficient, but not greater

12    than necessary to comply with the purposes of sentencing.

13         Those purposes include the need for the sentence to

14    reflect the seriousness of the crime, to promote respect for

15    the law and to provide just punishment for the offense.  The

16    sentence should also deter criminal conduct, protect the

17    public from future crime by the defendant and promote

18    rehabilitation.

19         In addition to the guidelines and policy statements,

20    I must consider the nature and circumstances of the offense,

21    the history and characteristics of the defendant, the need to

22    avoid unwarranted sentence disparities among similarly

23    situated defendants and the types of sentences available.

24         At this point I would ordinarily turn it over to the

25    defense first for any argument, as well as to Mr. Lengyel.

1    However, since there will be a video, as well as testimony, I

2    think it may make sense for the government to present that at

3    this time.  And then I can hear from the defendant and,

4    finally, from the government.  Any issues or modifications to

5    that plan of attack?

6              MR. SWEENEY:  That's fine with the government, Your

7    Honor.

8              THE COURT:  Mr. Dietz?

9              MR. DIETZ:  I'm fine with that, Judge.

10             THE COURT:  Mr. Sweeney, if you want to call your

11   witness and present the video at this time.

12             MR. SWEENEY:  Will do.  Thank you, Your Honor.  The

13   government calls John Baker.

14             THE COURT:  I should have added counsel, as well as

15   Mr. Lengyel, as well as Mr. Baker, can remove your masks while

16   speaking.

17             (Oath administered.)

18             THE DEPUTY CLERK:  State and spell your name for the

19   record.

20             THE WITNESS:  John Baker, J-O-H-N B-A-K-E-R.

21             THE COURT:  Thank you, Mr. Baker.  Have a seat.

22   Mr. Sweeney, you may proceed.

23             MR. SWEENEY:  Your Honor, is it okay to question from

24   here (indicating) rather than the middle podium?

25             THE COURT:  Whatever you feel comfortable doing.

1            MR. SWEENEY:  Thank you.

2                        JOHN BAKER

3      a witness herein, was duly sworn and testified as follows:

4                          -----

5                    DIRECT EXAMINATION

6      BY MR. SWEENEY:

7      Q.  Sir, would you please tell us your name and your

8      occupation.

9      A.  My name is John Baker.  I am a Pittsburgh Police

10     detective.

11     Q.  And how long have you been a detective or police officer

12     with the Pittsburgh Police?

13     A.  I have been with the Pittsburgh Police since August of

14     2012.  I have been a detective since 2018.

15     Q.  Were you assigned to be part of an investigation of

16     persons involved in burning of police vehicles during the riot

17     that occurred on May 30, 2020, in downtown Pittsburgh?

18     A.  Yes.

19     Q.  One of the police vehicles known as Unit 3212, was that

20     one of the vehicles that burned?

21     A.  Yes.

22     Q.  Where was that vehicle located at the time?

23     A.  It was parked on Centre Avenue right in front of the PPG

24     Arena, which is where the Pittsburgh Penguins play.  Right on

25     the street.

1   Q.  So if you're going to the main entrance down on Fifth
2   Avenue, to get to where the police vehicle was burned, would
3   it be accurate to say you would come down Fifth Avenue toward
4   town, make that first right and go up top and make a right
5   above the arena?
6   A.  Yes.
7   Q.  That's Centre Avenue up there?
8   A.  Yes.
9   Q.  Prior to the start of the property destruction, was there
10  a protest march in relation to the George Floyd incident?  Was
11  there a protest march in downtown Pittsburgh that day?
12  A.  Yes.  There was a protest march.
13  Q.  Approximately what time did it start, and where did it
14  begin?
15  A.  It approximately started at 2:00, and it was at Sixth and
16  Liberty.
17  Q.  In downtown Pittsburgh?
18  A.  Yes.
19  Q.  And approximately what time did the march end?
20  A.  Approximately between 4:00 and 4:30.
21  Q.  And where did it end?
22  A.  It ended in front of the PPG, where the police car was
23  parked.
24  Q.  Up there on Centre Avenue?
25  A.  Yes.

1    Q.  **At approximately what time did the destruction of the**

2    **vehicle begin; and how did it begin, if you know?**

3    A.  **It was approximately 4:30 on that day.  It started with as**

4    **the protesters were marching up Centre Avenue, the car was**

5    **parked.  So people started to stop.  And then we had an actor,**

6    **Brian Bartels, he started to actually destroy the vehicle by**

7    **throwing rocks at it and jumping on the vehicle.**

8    Q.  **Was the vehicle unoccupied at the time?**

9    A.  **Yes.**

10   Q.  **Where was the police officer who was assigned to that**

11   **vehicle when this all started?**

12   A.  **They were on a call previous to parking the car.  As the**

13   **march came up, it was approximately 3,000 to 5,000 people were**

14   **marching.  They actually stayed down at Centre and Washington**

15   **Place.**

16   Q.  **Were there some officers right above there helping to**

17   **conduct some construction equipment coming in?**

18   A.  **Yes.**

19   Q.  **One of those officers who was assigned to that car, was he**

20   **just above the car where the construction equipment was being**

21   **brought in?**

22   A.  **Yes.**

23   Q.  **Now, after Mr. Bartels spray painted and started doing**

24   **some damage to the vehicle, what did he do; and how did the**

25   **crowd react?**

1   A.  **As he started to spray paint the vehicle, he jumped on the**

2  **vehicle, was kicking the windshield.  It basically created a**

3  **crowd around the vehicle.  He then -- after he started**

4  **destroying the vehicle, another male came and broke the**

5  **windows out; and both males then left the scene.**

6   Q.  **Did Mr. Bartels then leave that area?**

7   A.  **Yes.**

8   Q.  **And how did the crowd behave or react after that?**

9   A.  **It incited the crowd.  It got them excited.**

10  Q.  **Were people in the crowd recording some of these events?**

11  A.  **Yes.**

12  Q.  **Was anyone from law enforcement recording these events?**

13  A.  **Yes.  We had city cameras that we call them that were**

14  **recording.  We also had the multiple Facebook videos and just**

15  **citizens from the PPG recording as well.**

16  Q.  **Was there a state police helicopter up above recording?**

17  A.  **Yes.  And there was the state police.**

18  Q.  **There were members of the crowd that had their cell phones**

19  **that were recording it?**

20  A.  **Yes.**

21  Q.  **Were you able to obtain some of those videos from the**

22  **participants in the crowd?**

23  A.  **Yes.**

24  Q.  **Approximately how many hours would you say you spent**

25  **reviewing the videos?**

1   A.  **100 hours, approximately.  There was a ton of videos,**

2   **multiple videos that people just sent in to us that we just**

3   **found online, plus our state -- plus the state trooper video.**

4   Q.  **Did you review any videos in preparation for your**

5   **testimony here today?**

6   A.  **Yes.**

7   Q.  **Did you review specifically three video clips the other**

8   **day in preparation for this?**

9   A.  **Yes.**

10  Q.  **Do those videos, to your knowledge, fairly and accurately**

11  **depict the scene as it existed that day up where the riot**

12  **began?**

13  A.  **Yes.**

14          **MR. SWEENEY:  Your Honor, I would offer as Government**

15  **Exhibit No. 1 the video that's been previously provided.**

16          **THE COURT:  Any objection?**

17          **MR. DIETZ:  No objection.**

18          **THE COURT:  That will be admitted.**

19          **MR. SWEENEY:  If we could play this video.  I will be**

20  **asking to pause it a little bit.**

21          **(Video played in open court.)**

22  <u>**BY MR. SWEENEY:**</u>

23  Q.  **Now, this first video, if we can pause that.  Who did this**

24  **video, to the best of your knowledge?**

25  A.  **This was YouTube video from Ashley Fox.**

```
 1    Q.  Ashley Fox posted it under the name "Ashley Fox"?

 2    A.  Yes.

 3    Q.  Has Ashley Fox been talked to by the Pittsburgh Police?

 4    A.  Yes.

 5    Q.  And did Ashley Fox verify the accuracy of this?

 6    A.  Yes.

 7    Q.  If we could play that.

 8            (Video played in open court.)

 9    Q.  Was this after Brian Bartels left?

10    A.  Yes.

11    Q.  Could you pause that.  Are these officers from the

12    Pittsburgh Bureau of Police?

13    A.  Yes.  Those are our mounted unit.

14    Q.  If you could play that.

15            (Video played in open court.)

16    Q.  Who is that that's depicted on the right side there?

17    A.  That's Da'Jon Lengyel.

18    Q.  The defendant in this case?

19    A.  Yes.

20            (Video played in open court.)

21    Q.  It appears that the police on horseback then leave the

22    scene?

23    A.  Yes.

24    Q.  What was the reason for that, to the best of your

25    knowledge?
```

1    A.   This video doesn't depict everything, but they started

2    having bottles and rocks thrown at them.  And they were

3    completely outnumbered at that time.

4    Q.  Could you hit "Play" again.

5            (Video played in open court.)

6    Q.  You recognize anyone on top of the vehicle?

7    A.  Yes.

8    Q.  Who is that?

9    A.  That's Da'Jon Lengyel.

10           (Video played in open court.)

11   Q.  Would you play the next video clip, please.

12           (Video played in open court.)

13   Q.  Do you know who created this video?

14   A.  Yes.  This video was created by Shawn Green, a/k/a he's

15   also known as Lorenzo Rulli.

16   Q.  Lorenzo Rulli, R-U-L-L-I?

17   A.  Yes.

18   Q.  Is he somebody that blogs and posted often on various

19   social media?

20   A.  Yes.

21           (Video played in open court.)

22   Q.  Who is saying they're going to light the vehicle?

23   A.  Lorenzo Rulli.

24   Q.  The one who is creating this video?

25   A.  Yes.

1                    (Video played in open court.)

2    Q.  Could you pause there.  Could you back it up a little bit.

3                    (Video played in open court.)

4    Q.  Do you recognize who is in the rear back seat area of the

5    vehicle?

6    A.  Yes.  That's Lengyel.

7    Q.  And what is he doing?

8    A.  He's putting items in the back of the vehicle.

9                    (Video played in open court.)

10   Q.  We'll go to the third video here.  Do you recognize this

11   video?

12   A.  Yes.  This is from the helicopter.

13   Q.  Was this state police footage that was given to WTAE?

14   A.  Yes.

15                   (Video played in open court.)

16   Q.  If you look in the rear area, do you see somebody bent

17   over in the back seat?

18   A.  Yes.

19   Q.  Have you been able to identify that person?

20   A.  At this point, no, we have not identified him or her.

21   Q.  And is this the person who appears to actually be the one

22   who ignites the fire in the back seat?

23   A.  Yes.

24                   (Video played in open court.)

25   Q.  The fire apparently has already started at this point?

1    A.  **Yes.**

2    Q.  **Would you hit "Play."**

3                **(Video played in open court.)**

4    Q.  **Is that the defendant again putting items in the back**

5    **seat?**

6    A.  **Yes.**

7                **(Video played in open court.)**

8                **MR. SWEENEY:  That's all the questions I have, Your**

9    **Honor.**

10                **THE COURT:  Thank you, Mr. Sweeney.  Mr. Dietz, any**

11    **questions?**

12                **MR. DIETZ:  Just very briefly.**

13                            **-----**

14                    **CROSS-EXAMINATION**

15    **BY MR. DIETZ:**

16    Q.  **Detective, you mentioned Brian Bartels or Bartels?**

17    A.  **Yes.**

18    Q.  **Was he charged as a result of his conduct in this case?**

19    A.  **Yes.**

20    Q.  **He plead guilty; is that right?**

21    A.  **I believe so, yes.**

22    Q.  **And are you aware that he was sentenced to one day in**

23    **prison and six months house arrest?**

24    A.  **No.**

25    Q.  **You're not aware of his sentence at all?**

1   A.   I knew he was sentenced.  I wasn't aware of the exact --

2   exactly what he was charged with.

3   Q.   You're aware he's not in jail now?

4   A.   No.

5   Q.   Thank you.

6             THE COURT:  Mr. Sweeney, anything?

7             MR. SWEENEY:  No redirect, Your Honor.

8             THE COURT:  Thank you, Detective.  I appreciate it.

9             MR. SWEENEY:  The government doesn't have any more

10   evidence, Your Honor.

11             THE COURT:  All right.  Thank you.  At this time I'll

12   hear from -- I should confirm, Mr. Dietz -- we talked about

13   this earlier.  I'm correct you don't have any additional

14   evidence, just argument; is that right?

15             MR. DIETZ:  That's correct, Judge.

16             THE COURT:  Mr. Dietz, at this point I'll hear from

17   you as well as from Mr. Lengyel as to any additional

18   information that you might want to present.  I will note a

19   question that I had, which it sounded like you were going to

20   discuss is, obviously, one of the considerations I have to

21   take into account is disparities among similarly situated

22   defendants, which would include, I think in this case,

23   Mr. Bartels potentially, as well as Mr. West, who will be

24   sentenced later today.

25             To the extent both counsel want to address that

1  issue, that would be helpful.  The other thing is for there to

2  be confirmation with respect to restitution.  I believe the

3  amount is stipulated at $25,000.  I'm not entirely sure if

4  that stipulation would be joint and several or what have you.

5  So if both of you are able to address that, I would appreciate

6  it.  Mr. Dietz, you may proceed.

7        MR. DIETZ:  Thank you, Judge.  May I stand at the

8  podium, Your Honor?

9        THE COURT:  Yes.  Please.

10        MR. DIETZ:  Judge, to start from where you left off,

11  there is a stipulation to restitution is $25,000 joint and

12  several with Christopher West, who will be sentenced later

13  today, obviously.

14        THE COURT:  Okay.

15        MR. DIETZ:  Judge, I filed a sentencing memo in this

16  case.  And I don't really want to rehash everything that's in

17  there, but there are a number of things that I do really want

18  to bring to the Court's attention about Mr. Lengyel.

19        You've got the benefit of the presentence report.

20  You've had the benefit of the video, and the government has

21  pored over hundreds of hours.  There is probably thousands of

22  hours of actual video of this event from various sources,

23  because, as I understand, the government is still trying to

24  recover the identity of a number of people who were involved.

25        I would like to highlight a few issues that I believe

1    are important in this case.  First off, Judge, under 18 USC

2    3553(a), your responsibility as a sentencing judge is to

3    sentence all men.  That sounds a little silly with the way I

4    said it, but the fact is you're not to confine your sentencing

5    discretion to just the crime.  And I know you know this, but

6    there is a lot more about Da'Jon Lengyel than just the

7    23-year-old kid that made the biggest mistake of his life

8    during that riot.

9         One of the unique factors about this case for me

10   personally, Judge, is that after Mr. Lengyel was charged and

11   we negotiated the plea agreement in this case, one of the

12   conditions of that plea agreement was for Mr. Lengyel to waive

13   his right to seek a variance in this case.  That's the first

14   time I've had to do that in almost 30 years of practicing law.

15   But, fortunately, post Blakely and that litany of cases, we

16   can no longer waive away your discretion at sentencing.  So

17   Mr. Lengyel's fortunate in that regard that, no matter what,

18   you're guided by 3553(a).

19        To touch on one of the points that you brought up,

20   sentencing disparity, well, there is obviously one reason for

21   sentencing disparities in federal court; and that is the

22   defendant's prior record.  I think when you take a look at

23   various defendants and their prior record, they're going to

24   have different guideline ranges.  I believe Mr. West is

25   different because of his guideline range.  Mr. Lengyel's

1    guideline range -- criminal history category puts him in a

2    certain guideline range.

3           But what's important about this case, Judge, is the

4    government -- well, first, Detective Baker just testified

5    about Brian Bartels.  Bartels received -- he was charged in

6    this case.  He received a sentence, I believe, of one day

7    imprisonment and six months house arrest.

8           He didn't ignite the car.  He didn't throw a piece of

9    paper into the car.  He didn't cause the fire to the car.  But

10   what's important, Judge, is what Detective Baker said.  He

11   started this whole thing, and he incited the crowd.

12   Mr. Bartels is described -- self-described as a left-wing

13   anarchist.  Mr. Lengyel has no political affiliation, no

14   political agenda.

15          As I get into more of my comments, you'll find out

16   that he's a kid that went down there and really screwed up,

17   royally screwed up.  He got involved.  He got incited.  He

18   wasn't loaded.  He didn't have a backpack on.  He wasn't

19   there -- he got wrapped up in the moment and committed the

20   biggest mistake of his life.

21          Now, I would ask you to consider the fact that Brian

22   Bartels' sentence is extremely, extremely light for the person

23   that incited that event when you fashion an appropriate

24   sentence.  Something I touched on in my sentencing memo,

25   Judge, and I'm going to touch on just briefly, because I laid

1     it out there, is when Mr. Lengyel was indicted, he was

2     detained.  He's been in pretrial detention.  I'm sure you're

3     hearing this a little bit more than anybody has ever said this

4     before due to the pandemic.  But the conditions that he has

5     been subjected to as a federal pretrial detainee, who until he

6     plead guilty had the benefit of the presumption of innocence,

7     have been so much worse than any pretrial detainee prior to

8     the beginning of this pandemic that I've ever experienced in

9     my life.  He's been subject to lockdown after lockdown.

10         And people have taken issue with this.  That

11    Allegheny County Jail, Judge, is a petri dish of COVID.  I

12    refused personally to go into that facility.  I have two

13    children of my own that are high risk, bad asthma.  I'm not

14    going to expose myself to a situation.

15         He's been on lockdown.  They've been denied rec time.

16    The food menu has become so narrow and so limited that they're

17    not getting the benefit of a traditional diet that they

18    usually get there.  Visitation, personal visitation has been

19    cancelled for these inmates.  It's almost -- almost like

20    solitary confinement, but they get to stay around each other,

21    generally.

22         I would ask the Court to consider that the time that

23    he served in pretrial detention has been so much more severe

24    than any pretrial detainees have ever served, and I would ask

25    the Court to consider that whenever you determine what the

1    appropriate sentence should be in this case.

2           Now, Judge, I welcome the opportunity to make the

3    next couple of comments with the audience that we have here

4    today.  I was the first person in my family on both sides of

5    my mom's family and my dad's family to go to college and get

6    accepted into college.  And I couldn't have done it without

7    the love and support of my parents and my extended family, for

8    that matter.  We're a very, very close family.

9           I'll never forget the day that acceptance letter

10   came, and my mom and dad cried.  I have two siblings.  Very

11   close family.  My mother passed away a couple years ago.  My

12   dad is now 80 years old.  He didn't miss a college football

13   game of mine at Grove City.  He didn't miss a high school

14   football game or high school softball game.  Me, my siblings,

15   my children, my dad is still there every week going to watch

16   my son play college football, watch my daughters play college

17   softball.

18          I have been the beneficiary of an unbelievable family

19   unit.  Ironically, Your Honor, I do have one child left in

20   high school.  She attends Hampton High School.  And I

21   certainly don't mean to make light of this particular moment;

22   but in a total coincidence, I know a number of these students

23   standing behind me.  I have seen them play sports.  I have

24   seen them involved in band.  I have seen them involved in

25   various activities.  I know a number of their parents.  I know

1    the relationships they have.

2          You have the presentence report in front of you,

3    Judge; and you've gotten to see what Mr. Lengyel's upbringing

4    was like.  His mother and father were never married.  They

5    terminated their relationship when Mr. Lengyel was four years

6    old, and he's seen his father one time since then and has no

7    relationship with him.

8          He has a number of siblings.  The only one he's in

9    contact with is his 18-year-old younger brother.  He was

10   raised by a grandmother and his mother.  What we've learned

11   about Mr. Lengyel is that his mother was a drug addict.  She

12   had a boyfriend.  And he was routinely abused as a child.  He

13   was burned with cigarettes by his mother.

14         He never had the mom and dad to say, "Da'Jon, get up.

15   Time for school.  Da'Jon, remember, you got to have good

16   grades if you want to stay on that football team.  If you want

17   to stay in band, you got to have good grades.  We're going to

18   get you to practice after school."

19         The presentence report indicates that he went without

20   food as a child.  That the power, the electric, was turned off

21   in his house as a child.  Now, that's not a defense to

22   anything he did here.  But when you have to sentence somebody

23   who is before you, we all don't come before Judge Ranjan on

24   the same slate.

25         He had no parental love.  He had no parental

1    guidance.  He's never had anybody guide him in his life on how

2    to have a healthy relationship with anybody.  He's been living

3    on his own since he's 22 years old.

4         There is nobody in this courtroom to support him

5    today.  Judge, I would just ask you when you sentence Da'Jon

6    Lengyel and you invoke your discretion that you consider the

7    fact that there may be reasons outside of the fact that he's a

8    bad guy, that he did the horribly illegal and misguided thing

9    that he did during that riot.

10        I would also ask, Judge, as set forth in the

11   presentence report, that he does -- and he acknowledged here

12   in court today to you, Judge, he does have some mental health

13   issues.  He has some dependency issues.  I would ask that you

14   consider that, too, when you fashion an appropriate sentence

15   and potentially order/recommend that he be considered for the

16   RDAP program.  And to the extent that he's sentenced to

17   federal prison that he be sentenced to a location as close to

18   Pittsburgh as possible.  Thank you.

19        THE COURT:  Thank you.  Mr. Lengyel, is there

20   anything that you would like to say on your behalf?  And if

21   so, you can come up to this podium.

22        THE DEFENDANT:  Good morning, Your Honor.  I would

23   just like to reiterate what Marty said.  This is -- I have

24   made a lot of stupid mistakes in my life, a lot.  None as

25   grand as the mistake I made on May 30th of 2020.  I've learned

a lot from my 17 months incarceration about myself and about how to conduct yourself as a man.  And what I was doing on May 30th wasn't what a grown man does.  It's what a child does.  Like Marty said, I had a rough upbringing.  That's probably why I'm still a little bit childish.  I'm a pretty happy-go-lucky guy, but I still have bad tendencies.  And I'm really sorry for what I did.

I'm sorry that I subjected my family, my daughter, my grandmother, who is 79 years old and getting ready to move on to the next life, to losing me for 17 months.  And I just really apologize, and I'm really sorry for it.

THE COURT:  Thank you, Mr. Lengyel.  I appreciate it.  Mr. Sweeney, is there any argument that the government would like to make for an appropriate sentence here?

MR. SWEENEY:  I'm sorry, Your Honor?

THE COURT:  Is there any argument that the government would like to make for an appropriate sentence?

MR. SWEENEY:  Yes.

THE COURT:  Please proceed.

MR. SWEENEY:  Your Honor, when you're looking at the factors under Section 3553, I would ask that the Court look particularly at 3553(a)(1) and 3553(a)(2)(b).  And under 3553(a)(1), there are two prongs; one relating to the defendant's -- to the nature and circumstances of the offense and the other one relating to the history and characteristics

1    of the defendant.  I'll first talk about the nature and

2    circumstances of the offense.

3           As Mr. Dietz pointed out, there is a range of conduct

4    that occurred that day.  Brian Bartels spray painted the car

5    and broke a window, and he left.  Then there's Mr. Lengyel,

6    who was fueling the fire by putting items in the vehicle.  And

7    then there was the unidentified person who actually lit the

8    fire.

9           So Mr. Lengyel was charged with conspiracy to commit

10   the arson, as well as the substantive offense of use of a fire

11   to destroy that vehicle, which would require a mandatory

12   minimum five years.  Mr. Lengyel did not plead to that and has

13   plead to a charge that would result in a guideline range,

14   which the government respectfully submits appropriately

15   addresses his involvement in the case.

16          Now, when you look at the history and characteristics

17   of the defendant, despite the sympathetic aspect, which I

18   don't argue with -- despite the sympathetic aspect of

19   Mr. Lengyel's life and his upbringing, I have no dispute with

20   what Mr. Dietz said or what Mr. Lengyel said.  He obviously

21   had a rough upbringing.

22          However, at the same time this is not his first time

23   being involved in a crime of violence.  As you look at the

24   presentence investigation report, he's plead guilty to a

25   strangulation charge with his girlfriend, simple assault and

1       then trying to pay her off to not testify against him.  So
2       this is not his first big mistake.  It's not his first one.
3       This is not his first rodeo, Your Honor.
4              And when you look at 3553(a)(2)(b) -- and I think
5       this section relating to sentencing is not often cited.  And
6       it relates to the need for the sentence imposed to afford
7       adequate deterrence to criminal conduct.  And the reason I
8       bring it to the Court's attention here is that not all cases
9       get much media attention or attention from the public in this
10      courthouse.  Most of the time nothing gets any attention
11      whatsoever.
12             But this case, Your Honor, will likely get some
13      attention.  And the folks who will pay most attention to it,
14      Your Honor, I respectfully submit, would be the people who
15      might consider engaging in this kind of conduct, getting
16      carried away at a riot to the point where violence is engaged
17      in, anarchy, if you will.  This is something that I think the
18      sentence should address and the Court should take into
19      consideration.
20             People will pay attention to this sentence, and the
21      people who will pay closest attention are the people who are
22      likely to engage in this type of conduct again.  Because I
23      think it's virtually certain that Pittsburgh is going to see
24      more protests in the future for a variety of things, some
25      unpredictable at this point.  But, nevertheless, if the

1    message is there that you face serious consequences when you

2    engage in this level of conduct, I think the sentence should

3    address that.  And so, Your Honor, I just ask that a sentence

4    be imposed within the applicable guideline range.  Thank you.

5              THE COURT:  Thank you.  Mr. Sweeney, is the

6    government aware of any reason why sentence may not be

7    pronounced at this time?

8              MR. SWEENEY:  No, Your Honor.

9              THE COURT:  Mr. Dietz, is the defense aware of any

10   reason why sentence may not be pronounced at this time?

11             MR. DIETZ:  No, Your Honor.

12             THE COURT:  I am prepared to proceed to sentencing.

13   Mr. Lengyel, if you would like to come back up to the podium

14   so I can see you better, I would appreciate it.

15             (Defendant complies.)

16             THE COURT:  Mr. Lengyel, in imposing a sentence in

17   your case, I considered all the materials submitted to me, the

18   sentencing guidelines, the information presented to me today,

19   including your statement to me.  And I have to say your

20   statement was well said.  I think it expressed great remorse

21   and self-awareness.  I really appreciate that.  I also

22   considered the other sentencing factors I'm required to

23   consider under Section 3553, which I discussed earlier.

24             I have considered all the required factors.  Some of

25   them weigh more heavily in your case than others.  I'm going

to start a little bit with your background.  While I think
Mr. Dietz, your lawyer, has done an excellent job and made a
really compelling case for the fact that there should be some
mitigation here based on your background, which I think we can
all acknowledge, although I can't stand in your shoes, you may
not have had the influences you need to make all the right
decisions.  But I have to weigh that, also, against some of
the other parts of your background including some of your
prior criminal history.  While not extensive, it does reflect
instances of disorderly conduct, some degrees of violence.

So I have to consider a sentence in this case that
will sufficiently deter further behavior.  So that's sort of
on one side of the equation.  I would also say I do consider
the fact that you have been in prison now at the jail for
17 months serving hard time, which I do think does counsel in
your favor here, balance all of that against some of the other
things, including the seriousness of the offense.

I think you've recognized that this was a big
mistake.  When I watched the video, I'm struck by a number of
things.  One, I'm struck with the fact there are a lot of
people in that area.  This was a big protest that was letting
out, it sounds like, right around the time this police car was
on fire.  And somebody -- you could have been injured.  A
number of other people could have been injured walking by.
That's a threat to the public and I think weighs in favor of

1    the serious offense.

2          The other thing, which is maybe not as physical, but

3    is equally important to me, is when I think of those George

4    Floyd protests, these are the images I'm remembering.  I'm not

5    remembering the images that happened at 2:00 of all the people

6    walking peacefully down Liberty Avenue and protesting up until

7    PPG.  And I suspect many other people in the Pittsburgh area

8    don't remember that.

9          What they'll remember is the tail end, which is the

10   police car on fire, which in a certain sense undermines the

11   cause, undermines people's First Amendment rights, those

12   people that have showed up there to engage in peaceful

13   protest.  So I weigh that, too, as a serious part of this

14   offense.

15         And, finally, I considered sentencing disparities.

16   We had Brian Bartels here who started this.  He was a

17   20-year-old anarchist from Shaler who started this by inciting

18   the riot, and I certainly think he played a significant role

19   in this case.  But I will say -- I think you will admit it

20   here -- you crossed the line.  There were times, I think, even

21   as I watched that video, where you could have retreated.

22         You might not have been the most culpable or

23   blameworthy person here like the other woman who lit the paper

24   on fire, but there were moments, I think -- and maybe you

25   recognize this -- where you could have pulled back and

 1     stopped, and it's bad judgment and maybe in hindsight
 2     something you wouldn't do again.
 3              So I weigh all those factors to gather holistically
 4     and try to come up with a sentence here that will adequately
 5     deter future criminal conduct, not only by you, but by other
 6     individuals.  So weighing all of that and weighing all of the
 7     factors of this case, based on the circumstances and evidence
 8     of this case, Mr. Lengyel, I will sentence you to Count 1 of
 9     the indictment to 27 months and commit you to the custody of
10     the Bureau of Prisons for that term.
11              As to Count 3, I hereby sentence you to a term of
12     imprisonment also of 27 months, but which will run
13     concurrently with that prior sentence.  So your total here
14     will be 27 months.  You'll get credit for time you spent on a
15     federal detainer.  Additionally, upon release from custody, I
16     hereby impose a term of supervised release of three years as
17     to both counts to run concurrently.
18              With respect to the conditions of supervised release,
19     I've already explained my tentative conditions.  I formally
20     adopt those.  Those were the conditions of supervised release.
21     You should review the judgment order carefully, which will
22     contain a written description of my judgment, as well as the
23     conditions of your supervised release.  I may have misspoke as
24     to the two counts.  I just want to make the record clear.  The
25     Count 1 sentence is 27 months.  As to Count 2, the sentence is

1    27 months.  They will run concurrently.

2         I find that you don't have the ability to pay a fine;

3    therefore, no fine will be imposed.  Restitution is stipulated

4    and mandatory in this case.  And, Mr. Lengyel, I'll order you

5    to pay restitution to the City of Pittsburgh in the amount of

6    $25,000.  You should be jointly and severally liable for this

7    amount with your co-defendant, Mr. West.

8         Mr. Lengyel shall make restitution payments from any

9    wages he may earn in prison in accordance with the Bureau of

10   Prisons Inmate Financial Responsibility Program.  Any portion

11   not paid in full at the time of Mr. Lengyel's release from

12   prison shall be paid as a condition of supervised release.

13   And the victim's recovery is limited to the amount of loss.

14        Mr. Lengyel's liability for restitution will end when

15   the victim receives full restitution.  And the Court finds

16   that Mr. Lengyel does not have the ability to pay interest.

17   Mr. Lengyel, I order you to pay a special assessment of $200.

18   That's due and payable to the United States District Court

19   Clerk immediately.

20        I considered all the Section 3553 factors and

21   explained which factors I gave the most weight to in this

22   case.  Are there any further sentencing factors under that

23   statute or other issues that anyone believes I failed to

24   address or consider?  Mr. Sweeney?

25        MR. SWEENEY:  Nothing else, Your Honor.

```
 1                THE COURT:  Mr. Dietz?

 2                MR. DIETZ:  No, Your Honor.

 3                THE COURT:  Mr. Lengyel, you do have the right to

 4    file an appeal.  You may remember your appeal rights are

 5    limited.  You can only appeal -- if the United States appeals,

 6    then you can appeal.  If the sentence exceeds the applicable

 7    statutory limits in the US Code, you may appeal.  Or if the

 8    sentence unreasonably exceeds the guidelines range determined

 9    by me, you may appeal.  You have the right to be represented

10    by a lawyer in any such appeal.  If you can't afford one, you

11    can ask the Court of Appeals to appoint one to represent you

12    at no cost.

13                If you cannot afford to pay the filing fees for an

14    appeal, the Court will waive those filing fees.  If you cannot

15    afford certified copies of necessary court records and

16    transcripts for an appeal, they will be furnished to you at

17    the expense of the government.  If you do want to appeal, you

18    must file a notice of appeal within 14 days of today.

19    Otherwise, you'll lose your right to appeal.

20                If you request it, the clerk of court will prepare

21    the notice of appeal on your behalf.  You should discuss that

22    option with your attorney.  Mr. Lengyel, do you understand all

23    of these appellate rights as I have just explained them to

24    you?

25                THE DEFENDANT:  Yes, Your Honor.
```

1              THE COURT:  Mr. Sweeney, will the government at this

2    time move to dismiss Count 2 of the indictment to Mr. Lengyel?

3              MR. SWEENEY:  We do so move.

4              THE COURT:  I would grant that.  Mr. Lengyel is

5    currently in custody based on the nature of his sentence.  I

6    will remand him to the custody of the United States Marshal

7    Service for transfer to the Bureau of Prisons.

8              Counsel, are there any additional matters that the

9    parties would like to bring to my attention?  Mr. Sweeney?

10             MR. SWEENEY:  Nothing from the government.

11             THE COURT:  Mr. Dietz?

12             MR. DIETZ:  No, Your Honor.

13             THE COURT:  Mr. Lengyel, I do wish you all the best

14   in the future.

15             THE DEFENDANT:  Thank you, Your Honor.

16             THE COURT:  Thank you.

17                             -----

18             (Whereupon, the above-captioned matter was

19   concluded.)

20                             -----

21                        I N D E X

22   WITNESS:                                      PAGE:

23   JOHN BAKER
        Direct by Mr. Sweeney                      12
24      Cross by Mr. Dietz                         20

25                             -----

1

2                        **C E R T I F I C A T E**

3

4            I, NOREEN A. RE, RMR, CRR, certify that the
   foregoing is a correct transcript from the record of
5  proceedings in the above-entitled case.

6

7
   s\ Noreen A. Re                    November 9, 2021
8  NOREEN A. RE, RMR, CRR             Date of Certification
   Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25